SCHERING–PLOUGH HEALTHCARE PRODUCTS, INC., Plaintiff,

v.

NEUTROGENA CORPORATION, Defendant.

Civ. No. 09–268–SLR.

United States District Court, D. Delaware.

April 8, 2010.

---

Sheldon K. Rennie, Esquire of Fox Rothschild LLP, Wilmington, DE, of Counsel Ronald J. Shaffer, Esquire, Scott L. Vernick, Esquire, Michawl Eidel, Esquire and Amy C. Purcell, Esquire of Fox Rothschild LLP, Philadelphia, PA, for Plaintiff.

Steven J. Balick, Esquire and Tiffany Geyer Lydon, Esquire, of Ashby & Geddes, Wilmington, DE, of Counsel Harold P. Weinberger, Esquire, Jonathan M. Wagner, Esquire and Jeremy A. Cohen, Esquire of Kramer Levin Naftalis & Frankel LLP, New York, NY, for Defendant.

**\*\*AMENDED OPINION**

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

Schering–Plough HealthCare Products, Inc. ("plaintiff") filed this action against Neutrogena Corporation ("defendant") on April 21, 2009. (D.I.1) Both parties are manufacturers of sunscreen products: plaintiff manufactures Coppertone ®-branded sunscreens; and defendant manufactures Neutrogena ®-branded sunscreens. Plaintiff alleges that defendant has released multiple advertisements containing false and misleading statements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. § 2532 (2009). (D.I.5) Defendant counterclaims that plaintiff has released similar print advertisements and television commercials containing false and misleading claims in violation of the Lanham Act and the DTPA. (D.I.33) On August 5, 2009,

642 F.Supp.2d 304 (D.Del.2009), the court denied plaintiff's motion for a preliminary injunction. (D.I. 4; D.I. 53) Defendant also moved for a preliminary injunction, but elected not to pursue it in favor of a prompt trial on the merits. (D.I. 38; D.I. 70) A bench trial was held between January 4 and 7, 2010. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367. Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Sunscreen Technology

1. The damaging effects of the sun to the skin are caused by ultraviolet ("UV") rays. UV rays are categorized in one of two ways: ultraviolet A ("UVA") rays that occur between the wavelengths of 320 to 400 nanometers; and ultraviolet B ("UVB") rays that occur between the wavelengths of 290 to 320 nanometers. UVB rays have been shown to cause skin cancer, while UVA rays contribute to skin damage (such as wrinkling and pigmentation) and can trigger the carcinogenic effects of UVB rays.

2. Different sun protection factors ("SPF(s)") are used to quantify a sunscreen's ability to protect against sunburn. While the SPF of a sunscreen undisputably characterizes its ability to protect against UVB rays, the parties disagree as to whether a sunscreen's ability to protect against UVA rays is also subsumed within the SPF measurement. Another measurement, protection factor A ("PFA"), can be used to quantify a sunscreen's protection against UVA rays.

## B.  Parties and Products at Issue

3.  Plaintiff owns and manufactures the Coppertone ® brand of sunscreens including the Coppertone Sport ® line which was first introduced in 1992. Defendant manufactures and markets sunscreen products including the Neutrogena Ultimate Sport ® line that was first introduced in late 2008. Defendant began advertising its Ultimate Sport ® line in March and April 2009.

4.  Coppertone Sport ® and Neutrogena Ultimate Sport ® both come in cans, as compared to bottles; the products utilize different methods of dispersion. Neutrogena ® employs isobutane, a chemical propellant, to release the sunscreen from its aerosol cans. The isobutane mixes with the sunscreen inside the can, and takes up at least 28% of the can's weight. (D.I. 105 at 504:21–22) Both sunscreen and isobutane are simultaneously expelled from the can when the can's actuator is depressed; isobutane evaporates when exposed to the atmosphere. (D.I. 105 at 548:4–14)

5.  Coppertone ® products use a "bag on valve" system whereby the sunblock is expelled by compressed ethanol. (D.I. 105 at 528:10–529:20) A bag inside the can contains the entire sunscreen formulation; compressed gas provides the propulsive force required to release the sunscreen.

1.  The parties seem to agree that some amount of propellant comes into contact with the skin. Plaintiff does not claim otherwise in its advertisements.

2.  Photostability "is the capacity of a sun protection product to sustain UV protection during exposure to sunlight; [s]unscreen products that are photostable inhibit the

(*Id.;* D.I. 103 at 74:8–19) There is no mixing of product and gas inside the can.[1]

6.  Sunscreen products must be photostable to achieve desired protection.[2] One of the most effective chemicals in blocking UVA rays is avobenzone,[3] which is not photostable. To achieve photostability of avobenzone within defendant's sunscreen products, defendant has patented a formulation of avobenzone with die thylhexyl 2,6–naphthalate and oxybenzone, and has given it the proprietary name "Helioplex ®." Plaintiff's sunscreen products protect skin from both UVA and UVB rays and are photostable without using Helioplex ®.

## C.  Contested Advertisements

### 1.  Defendant's "Best line" advertisement

7.  Plaintiff seeks to enjoin a Neutrogena Ultimate Sport ® sunscreen advertisement which bases a superiority claim on an "average" combined SPF and UVA score across the entire line of defendant's sport sunscreen products.

8.  During the 2009 sunscreen season, defendant ran a print advertisement claiming that Neutrogena Ultimate Sport ® is the "Best line sport sun protection" (hereinafter, the "Best line ad"). (PTX–2) The Best line ad contains the following bar graph.

breakdown of the product's sun protection ingredients when exposed to sunlight for prolonged periods of time." (D.I. 5, Agin Decl. ¶¶ 25–26)

3.  1–(4–methoxyphenyl)–3–(4–tert–butylphenyl)propane–1,3–dione; chemical formula $C_{20}H_{22}O_3$.

**helioplex** The technology behind superior UVA/UVB protection.

With **helioplex** UVA defense stays strong to help provide the highest combined UVA/UVB protection across the entire Neutrogena Ultimate Sport line. Precisely why it's the best line of sport sun protection.

(PTX–2) Below the title "Helioplex ® [-] The Technology behind superior UVA/ UVB protection" appears a side-by-side comparison of combined "UVA" and "SPF" protection for Neutrogena Ultimate Sport ® and Coppertone Sport ® sunblocks, Beside the chart appears the statement, "Best average UVA/UVB protection vs. leading sport lines."

9. Plaintiff asserts that the Best line ad violates the Lanham Act for several reasons: (1) the ad claims the "highest combined UVA/UVB protection across the entire Neutrogena Ultimate Sport ® line" (*id.*), but "fails to disclose the vastly different ranges of products in the Coppertone versus Neutrogena sport sunscreen lines included in th[at] 'average'" (e.g., SPF 15 to 70+ (plaintiff) versus SPF 55 to 70+ (defendant)); (2) defendant "double counts" the UVA element (which is already measured in the PFA test); and (3) PFA testing is not "scientifically sufficient" to support the "best line of sun protection" claim because defendant's evidence of PFA testing is "incomplete and rigid." (D.I. 94 at 1)

## 2. Plaintiff's commercial advertisement

10. Defendant's counterclaims concern a Coppertone Sport ® commercial that began airing in 2009 (hereinafter, "the CS commercial"). At trial, two versions of the CS commercial were introduced into evidence: a 16–second video clip; and a frame-by-frame pictorial. (DTX–1; DTX–2) Both are equivalent save for one segment that appears in the pictorial and not in the video sample. The commercial depicts two athletes running in the ocean, applying sunscreen spray, and then briefly running, swimming, and biking. The voice-over is as follows:

> You give your sport 100%—so should your sunscreen. Coppertone Sport ® spray and Neutrogena spray provide the same amount of sun protection. Coppertone Sport ® gives you better coverage. Waterproof, sweatproof—Coppertone Sport ®—100%.

(DTX–1) The "better coverage" statement is made by the announcer in connection with the following visual.

Text: Among clear sprays.

better protective coverage.

The "Coppertone spray" user is covered by blue shading, while the "Neutrogena spray" user is covered by slightly lighter blue shading. The text "better protective coverage" is * *overlain on the athlete using Coppertone Spray. Text at the bottom of the screen states: "Simulated coverage study results. Among sprays with comparable SPF."

11. The pictorial includes an additional scene not in the video clip admitted into evidence. That visual is as follows.

Text: Use as directed.

Neutrogena is 28% chemical propellant.

Across the chest of one athlete is "Coppertone spray"; "100% sunscreen formula"— on the other, "Neutrogena spray"; "28% chemical propellant." (DTX-2) The voice-over states: "Coppertone Sport ® is 100% sunscreen. Neutrogena ® is 28% chemical propellant." (*Id.*)

12. Defendant argues that plaintiff's claim of "better protective coverage" is literally false insofar as none of plaintiff's in vivo or in vitro testing established this fact. (D.I. 93 at 30–35) Defendant also asserts that plaintiff intended to convey a "better protection" message in the CS commercial; this claim is literally false because the testing supporting the CS commercial did not measure protection. (*Id.* at 36) Finally, defendant claims that the CS commercial violates the Lanham Act because it falsely states that Neutrogena Ultimate Sport ® users cover themselves with 28% chemical propellant, which is untrue. (*Id.* at 36–38)

**D. Legal Standards**

13. Section 43(a) of the Lanham Act provides that

a person who shall … use in connection with any goods or services … any false description or representation, including words or other symbols tending falsely to describe or represent the same … shall be liable in a civil action by any person … who believes that he is or is likely to be damaged by the use of such false description or representation.

15 U.S.C. § 1125(a). There are two different theories of recovery for false advertising under section 43(a): "(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers." *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993). The test for literal falsity is an objective one for the court's determination. "[I]f a defendant's claim is untrue, it must be deemed literally false" regardless of the advertisement's impact on the buying public. *Id.* at 943–44. Further, "only an unambiguous message can be literally false," and "[a] literally false message may be either explicit or

conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586–87 (3d Cir.2002) (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir.2000)) (internal quotations omitted). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, [ ] the less likely it is that a finding of literal falsity will be supported." *Id.* at 587 (internal quotations and citations omitted). Conversely, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendancy to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction." *Castrol*, 987 F.2d at 943.

■ 14. The DTPA prohibits conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding." 6 Del. C. §§ 2532(a)(8) & (a)(12). As "a complainant need not prove competition between the parties or actual confusion or misunderstanding" to prevail in an action under the DTPA, 6 Del. C. § 2532(b), proof of a Lanham Act claim would necessarily meet the requirements for a claim under the DTPA.

## E. Discussion
### 1. The "Best line ad"
#### a. Implied establishment claim

15. The court agrees with plaintiff that defendant's use of bar graphs signals that numerical values for "UVA" and "SPF" were derived from some manner of product testing. * * [ ] The Best line ad makes an "implicit establishment claim," i.e., one that "relies on scientific studies by making an implicit superiority claim or parity claim by showing a graph or diagram."[4] Plaintiff "must show that defendant's tests did not establish the proposition for which they were cited" in order to demonstrate literal falsity.[5]

16. Neither party has presented the court with the appropriate evidence it needs to do a proper analysis regarding defendant's PFA testing; plaintiff has not met its burden in this regard. Defendant presented its PFA values at the preliminary injunction hearing in this case; it relies on that testimony in its current papers. Plaintiff correctly points out that, during the bench trial, defendant did not expand on the summary-level testimony. Defendant cites only its witness's acknowledgment that PFA testing is a recognized industry measure for sunscreen performance. (D.I. 98 at 9–11) Defendant does not point to any specific data in its papers.[6] (*Id.*; D.I. 93 at 28)

---

4. *Procter & Gamble Pharms., Inc. v. Hoffmann–LaRoche Inc.*, 2006 WL 2588002, at *30, 2006 U.S. Dist. LEXIS 64363, at *109 (S.D.N.Y. Sept. 6, 2006).

5. *Castrol*, 977 F.2d at 63 (Where "defendant's ad explicitly **or implicitly** represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited") (citation omitted) (emphasis added).

6. Plaintiff points out several trial exhibits in which defendant's PFA data is contained, in its view, in incomplete form. (D.I. 94 at 12–14) Although defendant broadly cited plaintiff's PFA testing results, comprising nearly 200 pages of material (DTX 63; DTX 64), defendant has not clearly relied on any particular exhibits in its reply to plaintiff's implied establishment claim assertion.

17. The only testimony cited by plaintiff in support of its challenge to defendant's PFA-testing methodologies is a statement by Dr. Patricia Agin ("Agin"), a photobiologist and Fellow in plaintiff's Research & Development Group, that she would use the same midpoints for SPF in a PFA test. (D.I. 94 at 13, citing D.I. 108 at 154:13–21) Plaintiff argues in its papers that defendant failed to comply with this principle, but does not point to any testimony in support. Plaintiff cites no other testimony challenging defendant's methodologies. (D.I. 94 at 11–12) Notwithstanding the obvious deficiencies in defendant's substantiation of its PFA testing, plaintiff had the burden of proof on this issue, and it has not met that burden on this record.

### b. Literal falsity relating to "UVA"

18. In its preliminary injunction opinion, the court found that the pre-trial record did not support a finding of literal falsity with respect to the differentials between the combined SPF and UVA bars correlating to Coppertone Sport ® and Neutrogena Ultimate Sport ®. (642 F.Supp.2d at 316–17)

19. There remains no dispute between the parties on the math: (1) plaintiff offers products ranging from SPF 15 to 70+ under the "Sport ®" label, averaging SPF 38.5; (2) defendant offers products ranging from SPF 55 to 70+ under its "Ultimate Sport ®" label, averaging SPF 64; and (3) the difference between average SPFs "across the entire [ ] line[s]" (38.5 vs. 64) is a 40% SPF differential in favor of defendant's line. (D.I. 93 at 28; D.I. 97) The "SPF" portion of the bars for both products differs by about 40%;[7] there is no literal falsehood here.

20. Additionally, the **PFA** scores obtained by defendant across the entire product lines averaged 30.2 for Neutrogena Ultimate Sport ® and 16.7 for Coppertone Sport ®.[8] There is a near 100% difference in the relative heights of the **UVA** bars.* * [ ] Although the parties debate whether "UVA" is an appropriate measurement to convey to consumers, and whether it is essentially double-counted between the "UVA" and "SPF" portions of the bar chart, there is no dispute that PFA is a measurement of UVA protection. (D.I. 103 at 62:21–22; *id.* at 151:5–7; *id.* at 154:24–155:4; D.I. 105 at 465:4–5) The "UVA" bar for Neutrogena is approximately 100% larger than that for Coppertone; there appears to be a direct correlation between defendant's data and the graph.

21. The court agrees with plaintiff that the bar graph is misleading in several other respects—the first of which is defendant's utilization of "UVA" with "SPF" as a measure of protection in the first instance. "UVA" is a designation for ultraviolet light within the wavelength of 400 nm-* *320 nm—not a measurement of skin protection, Elsewhere, defendant has referred to either PFA or UVA–PF (protection factor) as units of measurement for UVA protection. (DTX–60; DTX–61; DTX–56–N293) Defendant does not argue that UVA is a measurement of protection in its reply papers, only that "there is nothing false about using PFA scores to make claims concerning UVA protection." (D.I. 98 at 6) Defendant did not use PFA scores to draw its comparison.

22. Defendant stacked a UVA value (of unspecified number) atop a SPF value (of

---

7. Because there are no values or scales associated with the bar graph, the truth or falsity of the bar graph must be ascertained using the relative proportions of the bars.

8. (D.I. 93 at 28, citing D.I. 37 at 135–37) Plaintiff does not dispute defendant's numbers, but does dispute whether defendant's PFA testing was scientifically reliable to support an implied establishment claim.

unspecified number) such that the Best line ad conveys that Neutrogena has twice the quantities of these measures. Plaintiff asserts that this stacking is literally false insofar as UVA protection is double-counted; it is subsumed within "SPF," and provided separately (under "UVA").

23. Plaintiff's double-counting argument was addressed in the court's preliminary injunction opinion. In view of inconsistencies between the experts regarding the percentage of UVA subsumed by the SPF measurement (20% vs. 10%), and evidence that consumers relate SPF strictly with UVB protection, the court declined to find (on that record) that the bar graph imparts an unambiguous message. (642 F.Supp.2d at 315–16)

24. Having now had the benefit of trial, the court is persuaded that its initial impressions regarding literal falsity were incorrect. Due to the predominancy of UVB in the SPF measurement, SPF is commonly understood to refer to UVB rays. As noted in the court's prior opinion, the FDA has issued a statement to this effect. (642 F.Supp.2d at 315–16) There is no dispute, however, that at least 10% of a "SPF" measurement correlates to UVA protection. (D.I. 98 at 7, citing D.I. 103 at 135:16–17 (20% UVA); D.I. 104 at 277:19–278:8 (10% UVA); *see also* D.I. 103 at 132:7–11)

■ 25. Defendant's ad does not equate SPF with UVB alone, but it is literally false because it provides a separate "UVA" quantification which is neither an accurate description of protection nor completely independent of the SPF value. The Best line ad clearly conveys, through the use of different colors and labels, that "UVA" and "SPF" are different measure-ments, and this is undisputably not so. While it is true that these errors are present with respect to both products compared in the graph, the absence of bias caused by the double-counting does not eliminate the falsity of the message.[9]

### c. Implied falsity

26. The crux of plaintiff's argument in this regard is that the Best line ad does not convey that Coppertone Sport ® has a lower **average** SPF "across the entire product line" (averaging SPF 15 to SPF 70+) than the Neutrogena Ultimate Sport ® line (averaging SPF 55 to 70+). The bars of the graph are labeled "Neutrogena Ultimate Sport ®" and "Coppertone Sport ®," respectively, without reference to any SPF's for either brand. Plaintiff essentially argues that consumers perceive the ad to reflect an apples-to-apples comparison of **similarly-labeled** sunblocks, for example, Neutrogena Ultimate Sport ® SPF 70+ (as pictured) and Coppertone Sport ® SPF 70+, while in fact the comparison is between the average SPFs of many products. The number of products compared in the depicted averages is not disclosed.

■■ 27. To make its claim that the Best line ad conveys an impliedly false message, "plaintiff bears the burden of proving actual deception by a preponderance of the evidence ... it cannot obtain relief by arguing how customers could react; it must show how customers actually do react." *Sandoz Pharma. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir.1990). To this end, plaintiff presented a survey conducted by Dr. Gary Ford ("Ford"), an independent consultant, which demonstrates (in his opinion) that

---

9. Plaintiff asserts that, if UVA/UVB equates to PFA and SPF, the Best line ad's statement that Neutrogena has the "highest combined UVA/UVB protection across the entire Neut-rogena ® Ultimate Sport ® line" is incorrect insofar as Coppertone's numbers are higher. The court need not evaluate this additional claim in view of its holdings.

"consumers perceive that they can get greater protection ... and/or durability from Neutrogena than Coppertone after seeing [the Best line ad]. (D.I. 104 at 230:9–12)

28. Ford's methodology included a "controlled experiment" where two groups of consumers were shown different advertisements—one group was shown the Best line ad (a "test group") and one group was shown a "control advertisement" ("control group"). Ford stated that he prepared the control advertisement by excising the allegedly misleading claims from the control advertisement, while keeping the rest of the control advertisement similar to the Best line ad. (*Id.* at 210:21–24; 212:2–5) Ford concluded that approximately 24% of the respondents "perceived that [Neutrogena] either offered greater protection or greater durability than Coppertone." (*Id.* at 221:13–17) It is plaintiff's position, based on Ford's results, that the Best line ad deceived a substantial portion of the intended audience by communicating the false message that all Neutrogena Ultimate Sport ® products provide better protection or more durability than Coppertone Sport ®. *See Novartis*, 290 F.3d at 591 ("survey evidence demonstrating that 15% of the respondents were misled ... is sufficient to establish actual deception or at least a tendency to deceive").

29. Dr. Ford's testimony was brief and summary-level, and the details of Dr. Ford's methodologies are not readily apparent from his testimony or plaintiff's

briefing. Dr. Ford testified that the methodology he used is contained in his expert report, however, the report was admitted into evidence with all of the narrative sections redacted.[10] (D.I. 104 at 207:21–208:4; PTX–204) The court declines to accept Ford's testimony on this record and, therefore, finds that plaintiff has not met its burden to prove actual consumer deception.

### 2. The CS Commercial

#### a. Establishment claim

■ 30. The court agrees with defendant that the "better coverage" claim of the CS commercial is an establishment claim that is not supported by sufficiently reliable tests. The CS commercial [11] plainly states that "[s]imulated coverage study results [a]mong sprays with comparable SPF" are represented by the blue "coverage" layovers on the two athletes. To this day, plaintiff has never performed an *in vivo* coverage study on either sport-labeled spray [12] featured in the CS commercial. Plaintiff has only performed *in vivo* testing on the Coppertone Ultra–Guard ® (SPF 50) and Neutrogena ® Fresh Cooling Mist ® (SPF 45) sprays. (D.I. 104 at 369:5–14) Those tests involved female subjects. (*Id.* at 370:6–8)

31. The blue layover in the CS commercial is directly derived from photographs taken from the Coppertone Ultra–Guard ® and Neutrogena ® Fresh Cooling Mist ® *in vivo* studies. Those *in vivo* studies were completed at cyberDERM

10. Apparently, plaintiff redacted all of the text preceding the "results" portion of Ford's report in response to an objection by defendant prior to trial.

11. Both the video clip and frame-by-frame pictorial. (DTX 1; DTX–2)

12. The court dismisses plaintiff's suggestion that the commercial is not literally false be-

cause it contrasts "Neutrogena spray," as compared to "Neutrogena Sport" or "Neutrogena Ultimate Sport ®." The commercial plainly compares two different "sport" sunscreens, claiming that "[y]ou give your sport 100%—so should your sunscreen." Coppertone Sport ® is depicted on the athlete as "Coppertone spray;" the plain import of "Neutrogena spray" in this context is also the sport-branded version.

Clinical Studies ("cyberDERM"), an independent company. (PTX–127) After applying sunscreen according to provided instructions, UV photographs were taken of the female subjects' abdomens and backs. (D.I. 104 at 321:10–17) The photographs were graded using three parameters to measure coverage: evenness, density, and thoroughness.[13] (Id. at 322:21–323:12) Coppertone outperformed Neutrogena in only the density category. (Id. at 336:16–25) Anna Erixon ("Erixon"), plaintiff's full-time clinical research consultant for sunscreens, testified that a sunscreen that is better with respect to density (even if equal to another in evenness and thoroughness) will provide better coverage to the consumer. (Id. at 337:1–9)

32. After the in vivo study, plaintiff conduced an in vitro study (via cyberDERM) in which a robotic apparatus was utilized to spray sunscreens onto a cardstock substrate. (PTX–131) Sprays generated from full cans of Coppertone Sport ®, Neutrogena Fresh Cooling Body Mist ® and Neutrogena UltraSheer Body Mist ® spray sunscreens (at three comparable SPF levels) were evaluated. (Id.; D.I. 104 at 343:21) Plaintiff found that Coppertone sprays deposited "two to three times" more product than the Neutrogena sprays. (D.I. 104 at 341:18–25; PTX–116)

33. Erixon testified that the testing confirmed that the results of the in vivo study were reproducible across multiple products in the first in vitro study and, as a result, plaintiff utilized the results from the in vivo study to make the CS commercial. (D.I. 104 at 348:23–350:21) Plaintiff

selected UV photographs from the in vivo study that represented the mean and standard deviation for coverage density for Coppertone Ultra–Guard ® and Neutrogena Fresh Cooling Mist ®. The color from the two representative photographs was changed from (original) purple to blue (to avoid the look of sunburn) and overlaid with the male athletes in the CS commercial. (Id.)

34. It is undisputed that, as of the date the commercial aired, plaintiff had not tested either Coppertone Sport ® or Neutrogena Ultimate Sport ® sprays in an in vivo study. (Id. at 363:12–25) The two photographs in plaintiff's commercial did not, therefore, represent actual data regarding either product in that advertisement. Erixon agreed that "neither photograph from [the] commercial represents what a Coppertone Sports or Neutrogena ® Sports spray would look like according to the methodology that [plaintiff] used." (Id. at 364:3–6)

35. Erixon testified that plaintiff did not test Neutrogena Ultimate Sport ® spray because it only selected sprays with "comparable SPFs." Neutrogena ® Ultimate Sport ® came in a SPF 55 and SPF 70 spray; it is unclear why this was not comparable to plaintiff's SPF 50 and SPF 70 sprays in the CS commercial. (Id. at 365:10–16) Erixon also stated that only the "best selling products" were selected. (Id. at 366:3–6) Regardless of the reason, plaintiff elected not to test Neutrogena's sport-branded spray,[14] yet it ran a head-to-head

---

13. Density referred to "the amount of product" on the skin; evenness referred to consistency of that density across the surface; and thoroughness referred to whether a subject "miss[ed] a spot." (D.I. 104 at 322:25–323:7)

14. Plaintiff states (in a footnote) in its papers, without citation, that "[t]he Neutrogena ® Ultimate Sport ® spray products were not on

the market at the time of the in vivo study." (D.I. 94 at 23, n. 19) Erixon testified to the contrary. (D.I. 104 at 365:11–21) Even if plaintiff were correct, it is of no benefit to plaintiff's case that it ran an advertisement against an unreleased product without having tested that product as its commercial claimed.

advertisement comparing its own sport spray sunscreen with Neutrogena's.

36. In response to the present litigation,[15] plaintiff commissioned a second *in vitro* study to compare Neutrogena Ultimate Sport ® SPF 55 and 70 and Coppertone Sport ® SPF 50 and 70 sunscreens. (D.I. 97 at 18; D.I. 104 at 352:21–353:12) Erixon testified that the results of this second study were comparable to that of the first; similar differences between the Coppertone and Neutrogena sprays were demonstrated [assumedly, in terms of spray density]. (D.I. 104 at 354:12–16) Erixon does not consider this second *in vitro* test support for the CS commercial (which had already run by this point), but would consider it supportive of future advertisements. (*Id.* at 355:21–356:6)

37. The issue at bar is whether plaintiff's *in vivo* testing of Coppertone Ultra–Guard ® and Neutrogena Fresh Cooling Mist ®, in view of its *in vitro* testing on Coppertone Sport ®, Neutrogena Fresh Cooling Body Mist ® and Neutrogena UltraSheer Body Mist ®, is sufficiently reliable to permit a consumer to conclude with reasonable certainty that plaintiff established its claim that Coppertone Sport ® spray provides "better protective coverage" than Neutrogena Ultimate Sport ® spray. The "sufficiently reliable" standard assumes that the tests in question, if reliable, would prove the proposition for which they are cited. *See Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.1992). It is defendant's burden to demonstrate that plaintiff has not proven that its tests were reliable. *Id.* (citation omitted).[16]

38. In support of its position, plaintiff relies on Erixon's testimony that the *in vivo* study established that the "bag-on-valve type **form** of product" provided better coverage than the "aerosol **form** of product" employed by Neutrogena—regardless of the formulation. (D.I. 97 at 13, citing D.I. 104 at 338:14–18) (emphasis added) The court finds this conclusion too sweeping to be properly based on a comparison of just one of plaintiff's products and one of defendant's products.

39. This conclusion is consistent with the undisputed fact that Neutrogena Ultimate Sport ® spray has a different formulation and different orifice size for its aerosol can than does Fresh Cooling Mist ®. Johnson & Johnson's [17] Senior Director for Scientific Affairs, Dr. Yohini Appa ("Appa"), testified that formulation differences between Neutrogena Fresh Cooling Mist ® spray and Neutrogena Ultimate Sport ® spray are such that extrapolation of test results from one to the other is impossible. Specifically, there is 40% more octocrylene (a sunscreen additive), 30% more of a "skin substantive polymer," and other solubilizers (e.g., butyl octyl salicylate) in the Ultimate Sport ® spray.[18] (D.I. 105 at 481:8–483:12) These ingredients "go into actual protection performance." (*Id.*) Defendant also presented the testimony of Dr. Nahed Mohsen, a consultant with experience in aerosol design, who testified that results of coverage testing on one product cannot be extrapolated to another product because of the difference in ingredients and orifice design. (D.I. 105 at 532:2–16)

---

15. The protocol for this study is dated November 12, 2009. (*Id.* at 353:19–20)

16. Courts have applied the preponderance of the evidence standard in assessing whether this burden of proof has been met. *See, e.g., Pfizer, Inc. v. Miles, Inc.*, 868 F.Supp. 437, 460 (D.Conn.1994).

17. Johnson & Johnson Beauty includes Neutrogena, Aveeno, and other brands.

18. Erixon characterized these as differences in the "inactive ingredients." (D.I. 104 at 420:10–11)

40. Plaintiff rightfully criticizes defendant's witnesses for failing to detail in what manner these factors affect spray performance or to substantiate this claim with any scientific evidence. Nevertheless, different Neutrogena sprays have differently sized spray orifices; the Ultimate Sport ® spray orifice is smaller than that for Fresh Cooling Mist ® spray. (D.I. 104 at 355:7–12; 420:15–16) Erixon admits that this could produce a different result when tested *in vivo*. (*Id.* at 420:17–19) Plaintiff's Director of Packaging, Science and Technology Michael Tune, when asked whether a smaller orifice could result in a higher spray rate, stated generally that "many factors [ ] influence spray rate;" there are "too many other factors" to "categorically" state that a small orifice results in a particular spray.[19] (D.I. 106 at 694:1–17)

41. Even had plaintiff tested the right products, its *in vivo* test is not sufficiently reliable to support plaintiff's coverage claim. When the *in vivo* test was designed, plaintiff did not identify specific goals vis-a-vis substantiation of the claim of better protective coverage. (D.I. 104 at 380:17–22) Plaintiff identified density, evenness and thoroughness as target measurements, but did not identify in advance what degree of superiority in which of the three categories it needed to demonstrate.[20] (*Id.* at 381:9–382:17) Plaintiff re-evaluated the density evidence after it determined that Coppertone Ultra–Guard ® did not prevail in the evenness and thoroughness categories.[21] (*Id.*) Erixon admitted that density does not equal coverage;[22] "that is why [plaintiff] measured evenness and thoroughness as well." (*Id.* at 382:24–383:2)

42. Based upon the foregoing, there are too many problems with plaintiff's *in vivo* testing of Coppertone Ultra–Guard ® and Neutrogena Fresh Cooling Mist ® for it to meet the "sufficiently reliable" standard with respect to Neutrogena Ultimate Sport ® spray sunscreen. Plaintiff utilized a non-standard protocol[23] designed to test protective coverage with no particular goal in mind. The course of the analysis was driven by the results obtained by the tests. There is no dispute that the ingredients and orifice size on the untested Neutrogena Ultimate Sport ® spray sunscreen differ from the product tested. The court cannot discern a true **scientific** basis for plaintiff's attribution of the Neutrogena Fresh Cooling Mist ® data to Neutrogena Ultimate Sport ®.[24]

19. The court finds this testimony convincing, as it seems to comport with the generally-accepted scientific principle that compositions of different molecular weights tend to have different properties. In this context, some differences in the formed aerosol droplets and their trajectories appear to be more likely than not.

20. This may have been partially due to the fact that density, evenness and thoroughness are "not established parameters in the literature." (D.I. 104 at 370:23–25)

21. Erixon stated, "[w]e decided to do the composite score and look at the data in a different way when we saw those results[.]" (D.I. 104 at 381:9–382:17) This composite score was not provided for in the protocol.

22. (D.I. 104 at 384:14–385:9; DTX–31C)

23. The court is cognizant of the fact (according to Erixon) that there is no standard test in the sunscreen industry to test protective coverage. (D.I. 104 at 367:12–14) The court does not seek to dissuade companies from developing novel protocols to test for properties (such as coverage) that are of interest to consumers. The issue in this case is not the novelty of plaintiff's test, but the overall unreliability of the test, a portion of which is attributable to the lack of protocol or cited industry support (even *post hoc* ) for plaintiff's methods.

24. According to Erixon, plaintiff's packaging experts measured the propellancy or the amount of propellant in the Ultimate Sport ® can and found it to be "**basically** the same" as

43. At trial, plaintiff's witnesses stated that the *in vivo* study substantiated plaintiff's coverage claim. (D.I. 104 at 364:21–365:4; D.I. 103 at 103:11–21) In its papers, plaintiff essentially argues that the *in vivo* tests plus the subsequent *in vitro* tests substantiate its claim. (D.I. 94 at 27) There were no *in vitro* tests involving Neutrogena Ultimate Sport ® conducted prior to the time the CS commercial aired. For this reason, the *in vitro* data does not demonstrate the necessary link between the Neutrogena Fresh Cooling Mist ® photograph to Neutrogena Ultimate Sport ®, as depicted in the CS commercial.

44. In conclusion, plaintiff elected not to test the competitive product at the heart of its advertisement and, instead, superimposed data from an *in vivo* test of **another** competitive product into its commercial. This type of unsubstantiated "scientific" claim is precisely what the Lanham Act seeks to prevent. Because the court finds that defendant has proven its Lanham Act and DTPA claims on this basis, it need not discuss defendant's arguments with respect to plaintiff's "best protection" claim.[25]

### b. Literal falsity—28% propellant

45. The court will briefly address the version of the CS commercial providing the "28% chemical propellant" statement. Defendant did not present survey evidence to support an implied message claim. It is defendant's opinion that the foregoing is an explicit message comparable to that found in *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312 (2d Cir.1982).[26]

46. In *Coca–Cola*, the advertisement at issue was an orange juice commercial featuring Olympic athlete Bruce Jenner.[27] Reviewing the district court's denial of a motion for preliminary injunction, the Second Circuit found the commercial false on its face because the orange juice product in question ("Premium Pack") is "heated and sometimes frozen prior to packaging." *Id.* at 318. Further, "pasteurized juice as it comes from the orange" was "blatantly false" because pasteurized juice does not come from an orange; pasteurization "entails heating the juice to approximately 200 [degrees] Farenheit[.]" *Id.* Even if the word "pasteurized" could be viewed as qualifying the visual images, the commercial "nevertheless represented that the juice is only squeezed, heated and pack-

---

those that had been examined. (D.I. 104 at 352:10–20) (emphasis added) "[W]e, as a team, felt that we had sufficiently covered the claimed Coppertone spray versus Neutrogena spray among comparable SPFs based on the *in vivo* and original *in vitro* study that we did." In view of the foregoing, Erixon's testimony is less than convincing. (*Id.*)

25. Use of the word "best" in advertising usually constitutes nonactionable puffery, as compared to an actionable falsehood; this is not the case, however, where a claim is juxtaposed with a comparison to a competitor's product. *See W.L. Gore & Assocs., Inc. v. Totes, Inc.*, 788 F.Supp. 800, 808–09 (D.Del. 1992).

26. The Second Circuit in *Coca–Cola* undertook a plenary review of the evidence presented; this approach was abrogated by Federal

Rule of Civil Procedure 52(a). *See Johnson & Johnson v. GAC Intern., Inc.*, 862 F.2d 975, 979 (2d Cir.1988). The Second Circuit has subsequently cited *Coca–Cola* as good law in terms of its literal falsity finding. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir.2007). The Third Circuit has also relied on the opinion. *See Novartis*, 290 F.3d at 594; *Castrol*, 987 F.2d at 943.

27. In that commercial, Jenner stated, "It's pure, pasteurized juice as it comes from the orange;" he then hand-squeezes an orange into a Tropicana ® carton while an announcer states: "It's the only leading brand not made with concentrate and water." *Coca–Cola*, 690 F.2d at 314.

aged when in fact it may actually also be frozen." *Id.*

47. *Coca-Cola* may not be completely analogous on its facts, but it does support defendant's literal falsity case in several important respects. The Second Circuit declined to find that the words used ("pasteurized") qualified the import of the visual image which made the "explicit representation that Premium Pack is produced by squeezing oranges and pouring the freshly-squeezed juice into the carton." *Id.* at 318. The Court also read the audio and visual components together to derive at the ultimate import of the ad, that is, the "represent[ation] that the juice is only squeezed, heated and packaged" and never frozen, *Id.*

48. The ultimate import of plaintiff's CS commercial, in the court's opinion, is that the Neutrogena sunscreen as applied on the athlete contains 28% chemical propellant. This is undisputedly false—the 28% propellant (by weight) of the Neutrogena can is used to expel the sunscreen and primarily evaporates when the aerosol is used.[28] The CS commercial plainly states that "Neutrogena is 28% chemical propellant." (DTX–2) (emphasis added) The CS commercial contrasts two **sunscreens**, not two **cans** or delivery methods. The plain import of the statement that "Neutrogena is 28% chemical propellant" is that the Neutrogena **sunscreen** is 72% sunscreen and 28% propellant. The overlay of the words "Neutrogena" and "28% propellant" on the (bare)

chest of one of the athletes (as compared to, for example, pictures of the respective cans) reinforces the message that 72% sunscreen and 28% propellant is applied to the body, rather than merely contained inside the can. There is no qualifying statement or language from which a consumer could conclude that the propellant is not deposited onto the skin in this amount or, alternatively, that the sunscreen (lotion) expelled by the can is 100% (and not 72%) sunscreen. This is an unambiguous message conveyed by necessary implication and, therefore, is literally false. *See Novartis,* 290 F.3d at 586–87 ("A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.") (citation and internal quotations omitted).

## III. CONCLUSION

49. For the foregoing reasons, the court finds that both the Best line ad and the CS commercial (in both forms) violate the Lanham Act and the DTPA.[29] An order shall issue by which the parties will be directed to address the scope of the appropriate injunctive relief.

---

28. Defendant's initial claim in this litigation was that none of the propellant reaches the skin. It is the court's understanding that it is currently undisputed that some minor amount may reach the skin, but neither party contends that the ratio is mathematically significant.

29. The court notes that these advertisements were essentially meaningless and, therefore, of no help to the consuming public who, finally, is paying attention to the health concerns presented by overexposure to the sun. Both parties failed in their efforts to walk that fine line between literal truthfulness and consumer deception in advertising. Sadly, it is the American consumer who ultimately ends up the real loser in these advertising wars.