**POM WONDERFUL LLC, Plaintiff,**

v.

**ORGANIC JUICE USA, INC., Defendant.**

**Organic Juice USA, Inc., Counter–Plaintiff,**

v.

**POM Wonderful LLC, Counter–Defendant.**

**No. 09 civ. 4916(CM).**

United States District Court, S.D. New York.

Jan. 3, 2011.

---

Christian D. Carbone, Loeb & Loeb LLP, New York, NY, Daniel Scott Silverman, Daniel Adam Beck, Roll Law Group P.C., Los Angeles, CA, for Plaintiff.

Alexander M. Kayne, Harvey Kurzweil, Adrienne May Hollander, Kelly Anne Librera, Dewey & Leboeuf, L.L.P., New York, NY, for Defendant.

Alexander M. Kayne, Harvey Kurzweil, Adrienne May Hollander, Kelly Anne Librera, Dewey & Leboeuf, L.L.P., New York, NY, for Counter–Plaintiff.

Christian D. Carbone, Loeb & Loeb LLP, New York, NY, Daniel Scott Silverman, Roll Law Group P.C., Los Angeles, CA, for Counter–Defendant.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS

McMAHON, District Judge:

Plaintiff, POM Wonderful LLC ("Pom") and defendant, Organic Juice, Inc. ("Or-

ganic Juice") are competing purveyors of bottled pomegranate juice. In its complaint, Pom alleges that Organic Juice violated federal and state laws by selling "adulterated" pomegranate juice, falsely labeled as "100% pure." In its answer, Organic Juice denies Pom's allegations, and counterclaims that Pom markets its product in an unlawfully deceptive manner by concealing from consumers the fact that Pom's juice is made from concentrate. Organic Juice subsequently amended its counterclaims to further allege that (1) Pom's website contains unsubstantiated claims regarding the health benefits of Pom's juice; and (2) that from 2002 to 2008, Pom added elderberry juice concentrate to its "100% Pomegranate Juice."

Before the Court are three motions: (1) Pom's motion for summary judgment on Organic Juice's counterclaims for false advertising; (2) Organic Juice's motion for partial summary judgment on same; and (3) Pom's motion to dismiss or for judgment on the pleadings as to several of Organic Juice's amended counterclaims. For the reasons set forth below, all motions are denied.

## I. FACTS

Pom produces and sells bottled "100% natural pomegranate juice" under the registered trademark "POM WONDERFUL." (Compl. ¶ 10.) Organic Juice competes with Pom in the bottled pomegranate juice market by importing and selling pomegranate juice that is produced, bottled and labeled in Ankara, Turkey, under the brand "Elite Naturel." (Compl. ¶¶ 8, 18.) Organic Juice sells two varieties of Elite Naturel pomegranate juice: (1) "100% Organic 100% Pure Pomegranate Juice" and (2) "Natural 100% Pure Pomegranate Juice." (*Id.*)

Pom produces its pomegranate juice "in-house." (Compl. ¶ 13.) Pom operates its own orchards, from which its pomegra-

nates are "picked, washed, and crushed [into juice]," and then "filtered and concentrated." (Comp. ¶ 12–13.) The concentrate is then frozen and stored—for up to three years—until it is selected for bottling, at which time "the concentrate is reconstituted to the original 100% concentration." (Comp. ¶ 12.) Pom admits that between 2002 and 2008, elderberry juice concentrate was added to the pomegranate concentrate prior to the reconstitution phase to improve the flavor of the product. (*See, e.g.,* Knight Dep. 74:11–20, June 8, 2010.) However, Pom maintains that the amount of elderberry juice added was so miniscule as to not render the "100% pomegranate juice" label inaccurate pursuant to FDA regulations. (Tupper Dep. 234:8–12, June 9, 2010.)

### A. Pom's Print Advertisements

Pom advertises its 100% Pomegranate Juice in several nationally circulated magazines. (*See* Decl. of Alexander M. Kayne in Sup. of Def./Counter–Pl.'s Opp. to Pl./Counter–Def.'s Mot. for Summ. J., July 14, 2010 ("Kayne Decl."), Exh. C.) Pom's print advertisements often—if not always—incorporate images of Pom's distinctively shaped bottle. (*See, e.g., id.;* Perdigao Dep. 37:14–38:14, June 11, 2010.) Pom's clear plastic bottle is shaped like two pomegranates stacked on top of each other, and the contents are deep red in color. On the actual product, the top bulb of the bottle contains the brand name, "Pom Wonderful," and the name of the juice, "100% Pomegranate Juice." (Organic Juice Ans. and Counterclaims ("Ans."), ¶ 80.) The bottom bulb lists the amount of juice in the bottle, *i.e.,* "16 fl oz (473 mL)," and the words, "from concentrate." (*Id.*) However, the writing on the bottom bulb does not appear in Pom's print advertisements. (*See* Kayne Decl., Exh. C; Decl. of Adrienne M. Hollander in Sup. of Def./Counter–Pl.'s Opp. to PL/Counter

Def.'s Mot. to Dis. or Req. for Judg. on the Plead., Nov. 8, 2010 ("Hollander Decl."), Exh. A.)

Pom claims that the writing on the bottom bulb is removed in the ads because it is "difficult to read when reproduced as a bottle image in print, and distracts from the main messages the advertisement is intended to convey." (Decl. of Matt Tupper, June 29, 2010 ("Tupper Decl."), ¶ 2.) Organic Juice, on the other hand, contends that the "from concentrate" label is removed in an effort to deceive consumers into believing that the juice is *not* made from concentrate. To buttress this allegation, Organic Juice has produced a document entitled "POM Wonderful Omnibus Focus Groups," dated September 29, 2003. (Kayne Decl., Exh B.) The document—which was prepared by a third-party marketing company at Pom's request—reports the results of focus group research relating to Pom's products. Under the heading "From Concentrate," the report makes the following observations:

POM is "from concentrate," and this phrase is a severe negative. Fortunately, none of the respondents knew this, and the same undoubtedly is true of the market in general. Therefore, POM should be very careful to do nothing that would allow this knowledge to spread.

(Kayne Deck, Exh. B at 19–20.) Pom claims that the focus group results played no role in Pom's advertising, noting that the bottle image used in Pom's print advertisements has remained the same both before and after the focus group research.

**B. The "Tree to Bottle" Video**

The "vertically integrated" nature of Pom's production process is a source of pride for the company, and part of Pom's marketing strategy is to highlight the attributes of Pom's "tree to bottle" production model, which differentiates Pom from its competitors. To this end, Pom created a promotional video (the "Tree to Bottle"

video) touting this aspect of the company. The video—which is just over a minute in length—begins by showing a worker cutting a pomegranate from a tree and placing it in a sack. The worker then boards the back of a truck and empties his sack of pomegranates into a container holding other pomegranates. Next, the video depicts pomegranates on a conveyor belt being washed and sorted, followed by some pomegranates being funneled into large pipes. Juice then flows from the pipes. The video then cuts to a machine molding plastic tubes into the distinctive shape of Pom's bottles. Next, the completed bottles move down a conveyer belt where they are filled with deep red pomegranate juice, capped, and date stamped. Finally, the full bottles are placed into cardboard boxes, presumably ready to be shipped to stores. (Ans. ¶ 77.)

The video also contains an audio voice-over. In its entirety, the voice over-states:

Welcome to Pom Wonderful Orchards in sunny central California. Here we grow and hand-pick each wonderful variety pomegranate that goes into our juice. Once the pomegranates are harvested, they are transported to our nearby juicing facility where they are washed, sorted and conveyed to the juicing machines. Our state of the art equipment delivers just the right amount of pressure to release the naturally rich red juice. Much of the healthy antioxidant goodness comes from crushing the whole fruit, husk and all. We even make and decorate our own distinctive bottles, shaped like two pomegranates stacked on top of each other. Then, we fill the iconic bottles with 100% natural pomegranate juice. We don't add any sugar or coloring, like some other pomegranate juice brands. In fact, every '16–ounce bottle contains the juice of four whole pomegranates. Once filled, the bottles are sealed and date coded to

maintain freshness. They are sorted into cases, loaded into refrigerated trucks, and shipped to a store near you. We are dedicated to ensuring quality from start to finish, to give you healthy, authentic pomegranate juice you can trust. Enjoy!

(Ans. ¶ 78.)

The video is embedded on a webpage entitled "Tree to Bottle," available under the "POM Truth" section of Pom's website. The following text appears on the webpage just above the video:

Tree to Bottle

POM is the only pomegranate juice that controls its juice from tree to bottle: bottle-to-bottle, batch-to-batch, year-to-year.

We grow and hand-pick our own fruit. And we squeeze our pomegranates using proprietary pressing equipment that we designed ourselves. This stringent quality control process results in 100% pomegranate juice with superior taste and a consistent dose of polyphenol antioxidants.

Unlike other brands, we don't buy juice from outside vendors, domestic or import. In fact, when we ran short of our own juice in 2006, we simply shipped fewer bottles of juice, We would rather make less money than destroy the integrity of POM Wonderful 100% Pomegranate Juice that our consumers have come to trust.

From our orchards to your home—enjoy in good health!

Watch our Tree to Bottle video below.

(Decl. of Daniel A. Beck in Sup. Of POM Wonderful LLC's Opp. to Def./Counter-Pl.'s Partial Mot. for Summ. J., July 14, 2010 ("Beck Deck"), Exh. G.)

Organic Juice claims that the "Tree to Bottle" video is misleading because it purports to describe the entire production process of Pom's product, but it fails to mention that the juice is concentrated, frozen, reconstituted and pasteurized. Pom denies that the video intends to show the entire production process of the juice. Instead, the primary purpose of the video is to highlight Pom's "vertically integrated" business model, and the video only highlights those aspects of the production process that exemplify Pom's "Tree to Bottle" production method.

## C. The Maronick Surveys

Hoping to uncover evidence supporting its false advertising allegations, Organic Juice retained Dr. Thomas J. Maronick to "design and implement two internet surveys to determine the extent to which, if at all, consumers are aware, after reviewing POM Wonderful ads, that POM Wonderful Pomegranate juice is made from concentrate." (Expert Rep. of Thomas J. Maronick, DBA, JD, Mar. 30, 2010 ("Maronick Rep."), ¶ 3.) Dr. Maronick is currently a professor of marketing at Towson University, and he previously worked for several years as an in-house marketing expert for the Bureau of Consumer Protection at the Federal Trade Commission ("FTC"). Since leaving the FTC in 1997, Dr. Maronick has testified as an expert witness in numerous marketing-related cases in federal and state courts. (Id. ¶ 2–3.)

Dr. Maronick conducted a total of three studies—two relating to Pom's print advertisements and one relating to the "Tree to Bottle" video. Dr. Maronick concluded that both the print advertisements (which portray the Pom bottle with the "from concentrate" language removed) and the "Tree to Bottle" video are misleading to consumers. (Id. ¶ 4.) Moreover, Dr. Maronick's studies revealed that consumers believe that pomegranate juice *not* made from concentrate is better in terms of freshness, healthfulness, taste and purity, and that each of these categories is important to consumers considering whether to purchase a particular juice. Therefore,

Dr. Maronick concluded that the misleading nature of the advertisements are material to the purchasing decisions of juice consumers. (*Id.*)

In response to Dr. Maronick's studies, Pom enlisted its own expert, Dr. Henry D. Ostberg, to refute Dr. Maronick's conclusions and to expose deficiencies in the methodology and execution of his surveys. (Expert Rep. of Henry D. Ostberg, Apr. 26, 2010 ("Ostberg Rep.").) Dr. Ostberg has been retained as a marketing research expert in connection with trademark and intellectual property litigation in over 200 cases, and he has testified in over 40 trials. (*Id.*)[1]

Dr. Ostberg's critique of the Maronick surveys is discussed in greater detail below. In short, Dr. Ostberg claims that Dr. Maronick's research contained several "major defects," including (1) the inappropriate use of an internet panel; (2) the use of an improperly defined "universe" of respondents; (3) key survey questions that were "unclear, confusing and almost incapable of being answered;" (4) the lack of an "I don't know" answer option for a key closed-ended question; and (5) significant errors in the surveys' execution and the subsequent report prepared by Dr. Maronick that "undermin[e] the integrity of the whole survey." (*Id.* ¶ 11.)

## II. PROCEDURAL HISTORY

Pom commenced this suit on May 26, 2009, claiming that Organic Juice violated federal and state law by selling "adulterated" pomegranate juice. On August 28, 2009, Organic Juice filed its Answer and Counterclaims. On April 27, 2010, Organic Juice filed a motion for leave to amend its Answer and Counterclaims. Organic Juice sought to add two amended counterclaims: (1) that Pom violated federal and state law by adding elderberry concentrate to juice

it advertised as "100% Pomegranate Juice," and (2) that Pom made false claims about the health benefits of Pom's products. The first proposed amended counterclaim arose from discovery documents exchanged by the parties in February 2010. The second proposed counterclaim arose from a February 23, 2010 letter written by the Food and Drug Administration ("FDA"), which opined that health claims appearing on Pom's website amounted to violations of the Food, Drug and Cosmetic Act ("FDCA") and FDA regulations. Organic Juice also sought to amend its answer to include an unclean hands defense.

On June 30, 2010, Pom filed a motion for summary judgment dismissing Organic Juice's original counterclaims. On the same day, Organic Juice filed its own summary judgment motion, seeking judgment in its favor on its false advertising claims relating to the "Tree to Bottle" video.

By order dated September 29, 2010, 2010 WL 3912222, the Court granted Organic juice leave to amend its Answer and Counterclaims (Docket No. 58), holding that Organic Juice offered good cause for the delay in bringing the amended counterclaims, and that Pom was not unduly prejudiced by the additional counterclaims and affirmative defense.

Finally, on October 21, 2010, Pom filed a motion to dismiss or for judgment on the pleadings as to the amended counterclaims relating to the February 23 FDA letter.

## III. DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

1. Neither party disputes the qualifications of the other party's expert. Indeed, both Dr. Maronick and Dr. Ostberg's appear to have unassailable credentials.

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

### A. Pom's Motion for Summary Judgment on Organic Juice's Counterclaims is Denied

Organic Juice alleges that Pom's print advertisements and "Tree to Bottle" video violate § 43(a) of the Lanham Act, and §§ 349 and 350 of the New York General Business Law. Pom argues that it is entitled to summary judgment on these claims because Pom's print advertisements and "Tree to Bottle" video are not literally false, and Organic Juice has failed to provide sufficient extrinsic evidence to support its claim that the ads and video are impliedly false.

#### 1. Applicable Legal Standards

The legal standards relating to Organic Juice's state law claims are identical to those employed under § 43(a) of the Lanham Act in all relevant respects. *See Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F.Supp.2d 165, 178 n. 6 (S.D.N.Y.2004) (citations omitted).

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), states in relevant part:

(1) Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—

. . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A false advertising claim premised on § 43(a) may be based on one of two theories: "that the challenged advertisement is literally false, *i.e.*, false on its face," or "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir.2007), "Where an advertising claim is literally false, 'the court may enjoin the use of the claim

without reference to the advertisement's impact on the buying public.'" *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir.2010) (*quoting McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991)).

■ "To succeed in a likelihood-of-confusion case where the statement at issue is not literally false, however, a plaintiff 'must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers,' and must 'demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'" *Tiffany (NJ) Inc.* at 112–13 (*quoting Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir.1992)).

■ In most likelihood-of-confusion cases, the required extrinsic evidence will come in the form of expert consumer surveys. *See THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 230 (S.D.N.Y.2010). To prove that an advertisement is impliedly false, "the plaintiff must come forward with specific scientific survey evidence of consumer reaction. The Court's own perception of whether or not the advertising is misleading is irrelevant and insufficient." *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 614 F.Supp. 1278, 1319 (S.D.N.Y.1985). *aff'd in part and vacated in part on other grounds*, 781 F.2d 198 (2d Cir.1986).

### 2. *Legal Standards for the Admissibility of Survey Research*

■ Organic Juice offers the Maronick surveys as evidence that Pom's print advertisements and "Tree to Bottle" video are misleading. Pom claims that the surveys are so seriously flawed in their execution and methodology that they are inadmissible. Because the Court may only evaluate admissible evidence when consid-

ering a motion for summary judgment, Pom's motion for summary judgment on Organic Juice's Lanham Act claims hinges on whether the Maronick surveys are admissible. See Fed.R.Civ.P. 56(c); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997). "[I]f the expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence." *Rexall Sundown Inc. v. Perrigo Co.*, 651 F.Supp.2d 9, 25 (E.D.N.Y.2009) (*citing Raskin* at 66–67).

■ The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the Rule 702 requirements have been met. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 n. 10, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.2007). However, "the district court is the ultimate 'gatekeeper.'" *Williams*, 506 F.3d at 160. Under *Daubert* and its progeny, the district court must perform this gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not

only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786.

■ "[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Malletier*"), 525 F.Supp.2d 558, 561 (S.D.N.Y. 2007) (internal quotations omitted). As the Supreme Court noted in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786.

■ When evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility. *Malletier,* 525 F.Supp.2d at 562–63. However, "the Second Circuit has made clear that this [general rule] is 'subject, of course, to Rule 403's[2] more general prohibition against evidence that is less probative than prejudicial or confusing.'" *Id.* at 563 (*citing Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 228 (2d Cir.1999)). "Although it is the exception, there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact .... and its probative value is substantially outweighed by its prejudicial effect." *Malletier,* 525 F.Supp.2d at 563 (internal quotations, footnotes, and citations omitted).

### 3. *Admissibility of the Maronick Surveys*

Dr. Maronick conducted a total of three surveys, all of which were done online through an internet survey platform called Zoomerang.com. (Maronick Rep. ¶ 7.) The participants for each survey were individuals twenty-one years of age and older who had purchased pomegranate juice in the past year or "would consider purchasing it." The sample group was limited to individuals living in New York, New Jersey and Connecticut. (*Id.* ¶ 6.) Dr. Maronick conducted two surveys relating to Pom's print advertisements, and one survey relating to the "Tree to Bottle" video.

#### a. *The Print Advertisement Surveys*

Each of the print advertisement studies surveyed 200 qualified respondents. Each respondent was randomly assigned to a "test" group or a "control" group. The 200 respondents in the "test" group answered questions based on an unaltered Pom print ad, which included an image of the Pom bottle with the "from concentrate" label removed. The 200 respondents in the "control" group answered the same questions, but based their responses on an ad that was edited to include the words "from concentrate" on the bottle. (Maronick Rep. ¶ 8.)

Respondents from each group were instructed to "look at the ad and bottle as you would if you were considering buying pomegranate juice." (Maronick Rep., Exh 2.) The respondents were then asked an open-ended question: "What does the ad say or suggest about this pomegranate juice?" Respondents were required to write-in four responses. Next, respondents were asked a closed-ended question: "Based on what is said or suggested in the ad, how is POM Wonderful made?" Six answer choices were provided, and respondents had to pick one. The answer choices were: (1) "From fruit without any process-

---

**2.** Fed.R.Evid. 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

ing," (2) "From concentrate without any processing," (3) "From fruit but with some processing," (4) "From concentrate but with some processing," (5) "From artificial flavors," or (6) "Other, please specify." (Maronick Rep., Exh 2.)

Next, respondents were asked another closed-ended question: "Based on what is said or suggested in the ad, is POM Wonderful Pomegranate juice made from concentrate?" The answer choices were (1) "Yes," (2) "No," or (3) "Don't know/Not sure." (Maronick Rep., Exh 2.)

Respondents were then asked to rank the importance of several juice attributes (freshness, healthfulness, taste, purity, and color) on a spectrum ranging from "Not at all important" to "Very important." Next, respondents were asked, "How does juice made from concentrate compare to juice that isn't from concentrate on each of the factors below?" Respondents ranked the same attributes as in the previous question on a spectrum ranging from "Concentrate is much better" to "Not from concentrate is much better." Finally, respondents answered some demographic questions. (Maronick Rep., Exh 2.)

As to the open-ended question ("What does the ad say or suggest about pomegranate juice?"), none of the "test" group respondents provided a response that included the word "concentrate," while 5.5% of the "control" group respondents included the word "concentrate" in one of their four responses to the question. (Maronick Rep. ¶¶ 10, 14.) As to the first closed-ended question ("Based on what is said or suggested in the ad, how is POM Wonderful made?"), 9% of respondents answered "from concentrate," either with or without some processing. (*Id.* ¶ 11.) Among the "control" group, 32% of respondents answered "from concentrate" with or without some processing. (*Id.* ¶ 15.) As to the second closed-ended question ("Based on what is said or suggested in the ad, is POM Wonderful Pomegranate juice made from concentrate?"), 19% of the "test" group respondents answered "yes," compared with 41% of the "control" group. (*Id.* ¶¶ 12, 16.)

Based on these results, Dr. Maronick concluded that a statistically significant number of consumers are likely to be confused by Pom's advertisements. (*Id.* ¶ 24.) While the open-ended question was inconclusive (only 5.5% of the "control" group included the word "concentrate" in their responses), the closed-ended questions revealed that respondents in the "control" group were more than 20% more likely to believe that the juice was made from concentrate compared to the "test" group. Furthermore, both groups of respondents believed that pomegranate juice *not* from concentrate is better in terms of freshness, healthfulness, taste, and purity; and respondents considered each of these factors to be important when contemplating a pomegranate juice purchase.

### b. *The "Tree to Bottle" Video Survey*

A third group of 200 qualified respondents answered the same questions discussed above after viewing the "Tree to Bottle" video. When asked the open-ended question, "What does this ad say or suggest about this pomegranate juice?", none of the respondents mentioned the word "concentrate." (*Id.* ¶ 18.) When asked the closed-ended question, "How is POM Wonderful made?", only 11% of respondents selected "from concentrate" with or without some processing. (*Id.* ¶ 19.) When asked, "Based on what is said or suggested in the ad, is POM Wonderful made from concentrate?", 27% said yes, 71% said no, and 2% didn't know or weren't sure. (*Id.* ¶ 20.)

Based on these results, Dr. Maronick concluded that "POM Wonderful has misled consumer[s] by implying that [its juice]

is made from fruit, not concentrate. Moreover, like respondents who saw the print ads, a very high percentage of respondents believe that pomegranate juice not made from concentrate is better in terms of freshness, healthfulness, taste, and purity and each of those factors are [sic] considered important to respondents." (*Id.* ¶ 23.)

### c. *Expert Report of Dr. Henry Ostberg*

Pom retained the services of Dr. Ostberg to offer an opinion regarding Dr. Maronick's report. Dr. Ostberg concluded that Dr. Maronick print advertisement surveys "suffered from a series of fatal defects," including:

- The survey was limited to internet users who were members of a pre-recruited panel (although the subject matter of the surveys had no connection to internet use).
- The respondents interviewed included past purchasers of pomegranate juice (although only prospective purchasers are the proper universe for a false advertising claim).
- Even the respondents who Dr. Maronick considered to be prospective purchasers were not really prospective purchasers of pomegranate juice.
- The key questions of the interview were unclear, confusing and almost incapable of being answered
- Respondents were not offered a "don't know" answer option for a key close-ended question (forcing respondents to select among alternative answers even when they had no opinion about the issue).
- There was no rotation of the pre-listed answer options to the closed-ended questions.
- Both the survey in its execution and the subsequent Maronick report evidenced significant errors, undermining the integrity of the whole survey

(Ostberg Rep. ¶ 11.) Dr. Ostberg also concluded that the "Tree to Bottle" survey suffered from "most of the same defects" as the print advertisement surveys, plus an additional defect; the lack of a control.

To substantiate his claim that errors in the execution of the surveys and Dr. Maronick's subsequent report undermine "the integrity of the whole survey," Dr. Ostberg primarily relies on an inadvertent error in the design of Dr. Maronick's "test" group survey for the print advertisement. (Ostberg Rep. ¶¶ 35–36.) Dr. Maronick intended to design the survey so that after respondents answered the questions relating to the "test" ad (the ad without the "from concentrate" label on the bottle), they would "skip" to the demographic questions at the end of the survey. However, the "skip" command failed. As a result, respondents in the "test" group answered the questions relating to the "test" ad, but they then answered the questions a second time while viewing the *control* ad (the ad *with* the from concentrate label). (Maronick Rep. ¶ 14, n. 4.) To compensate for the error, Dr. Maronick excluded the "test" group's responses to the "control" group questions from his results. According to Dr. Maronick, the survey did not allow the "test" group respondents to go back and change their answers to the "test" group questions after they subsequently viewed the "control" ad. However, Dr. Ostberg contests this assertion, noting that there is no proof that respondents could not go back and change their answers. Furthermore, Pom offers evidence purporting to show that the "test" group respondents *could have* changed their answers after viewing the "control" ad, depending on the "resolution setting" on their internet browsers. (*See* Supp. Deck of Daniel Beck, ¶¶ 2–6.)

The Court need not dwell on this issue, because even if Pom is correct, and the

"test" group respondents could have changed their original answers after viewing the "control" ad, Pom would have *benefited* from the error rather than being harmed by it. Presumably, the "test" group respondents would change their answers to suggest that Pom is made from concentrate, because the only difference between the "test" ad and the "control" ad is the presence of the "from concentrate" designation on the bottle featured in the "control" ad. The result would be *less* discrepancy between the answers given by both groups, meaning that the surveys would show *less* evidence of consumer confusion. Nevertheless, the Court notes Pom's more general concern relating to this flaw in the survey design, *i.e.*, that it may evidence a lack of diligence on the part of Dr. Maronick in designing and implementing his surveys.

### d. *Pom's Additional Concerns Regarding the Maronick Surveys*

In addition to the "fatal flaws" exposed by Dr. Ostberg, Pom claims that the Maronick surveys suffer from additional deficiencies that ought to render the surveys inadmissible. First, Pom claims that Dr. Maronick improperly used a "reading" test rather than a "memory" test in the print advertisement surveys. A reading test allows respondents to view the stimulus (in this case, the advertisement) *while* they answer questions relating to it. In contrast, a memory test asks respondents to first view the stimulus, and then answer questions based on what they remember seeing. Pom concedes that a reading test is not patently inappropriate when conducting surveys designed to measure consumer confusion, but it alleges that a reading test was inappropriate in this particular instance.

Second, Pom faults Dr. Maronick for using closed-ended questions rather than only open-ended ones, arguing that this method of questioning was impermissibly leading. Pom further argues that the wording of the closed-ended questions themselves were leading. Pom also claims that the survey results fail to evidence the presence of consumer confusion.

With respect to the "Tree to Bottle" survey, Pom expresses concern that respondents did not view the video in the proper context. Specifically, respondents were not shown the text that immediately precedes the video on Pom's website. In his deposition testimony, Dr. Maronick admits to mistakenly believing that the video was a television advertisement, not a video pulled from Pom's website. (Maronick Dep. 359:5–11, May 20, 2010.) Pom claims that showing the video out of context renders the survey results unreliable because the text of the webpage clearly demonstrates that the video is meant to highlight Pom's "Tree to Bottle" production method, not the entire production process of Pom's juice.

### e. *The Maronick Surveys are Admissible*

■ Pom's criticisms of the Maronick surveys are thorough and well-articulated, and Pom may very well convince a trier of fact that the surveys should be given little or no weight. This is particularly true with regards to the "Tree to Bottle" survey, as the fact that the respondents were not shown the text from the webpage may severely undercut the survey's reliability. Nevertheless, the surveys are admissible. The methodological flaws alleged in Dr. Ostberg's report go to the weight to be given to the surveys, not their admissibility. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987). Courts in this district have routinely admitted flawed survey evidence where the evidence does not appear to be devoid of all probative value. *See, e.g., Cache, Inc. v. M.Z. Berger & Co.*, No. 99 civ.

12320(JGK), 2001 WL 38283, at *11 (S.D.N.Y. Jan. 16, 2001) (collecting cases) Furthermore, Pom's claims that the print advertisement surveys are inadmissible because they inappropriately employed a reading test and impermissibly asked leading closed-ended questions are undercut by the fact that Pom's *own expert* does not cite these flaws among the myriad critiques in his report.

 As discussed above, "the Federal Rules of Evidence favor the admissibility of expert testimony," *Malletier*, 525 F.Supp.2d at 561, and the alleged flaws in the Maronick surveys do not suggest that the surveys' probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed.R.Evid. 403. Where there is "sufficient indicia of reliability" to allow admission of expert testimony, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Rexall*, 651 F.Supp.2d at 28 (*quoting Daubert*, 509 U.S. at 596, 113 S.Ct. 2786). Therefore, Pom's critique of the Maronick surveys can be properly employed on cross examination.

In sum, because the Maronick surveys are admissible, and they tend to show likely consumer confusion relating to Pom's print advertisements and the "Tree to Bottle" video, Pom's motion for summary judgment is denied.

## B. Organic Juice's Motion for Partial Summary Judgment is Denied

 Organic Juice moves for summary judgment on its Lanham Act and state law claims relating to the "Tree to Bottle" video, on the theory that the video is "false by necessary implication." The motion is denied.

As discussed above, a plaintiff can prevail on a claim under § 43(a) of the Lanham Act by proving, *inter alia*, that a competitor's advertisement is literally false. In *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir.2007), The Second Circuit formally adopted the doctrine of "false by necessary implication," a subspecies of literal falsity. "If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required." *Id.* at 158 (*citing Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir.2002)).

*Time Warner* involved a television commercial in which the actor William Shatner praised the HD picture quality of DIRECTV, and then made the statement: "settling for cable would be illogical." *Id.* The court held that this statement necessarily implied that DIRECTV'S HD picture quality was superior to that provided by Time Warner cable, which was not true. Therefore, the commercial was literally false, and Time Warner was not required to provide extrinsic evidence of consumer confusion. *Id.*

Organic Juice argues that the "Tree to Bottle" video necessarily implies that Pom's juice is *not* made from concentrate, because the video purports to depict the entire production process of Pom's 100% Pomegranate Juice, but omits any visual depiction or discussion regarding the fact that the juice is pasteurized, concentrated, frozen, and reconstituted before it is bottled.

Organic Juice's argument relies heavily on *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312 (2d Cir.1982). In that case, the Second Circuit held that an Orange Juice commercial showing Olympic athlete Bruce Jenner squeezing an orange

into a glass, and then pouring the contents of the glass into a Tropicana carton, was literally false. In reality, the juice is heated and sometimes frozen before packaging. *Id.* at 318.

Organic Juice's reliance on *Coca–Cola* is misplaced. Unlike the Bruce Jenner ad, the "Tree to Bottle" video does not explicitly claim to represent the *entire* production process of Pom's juice. Therefore, the conclusion that Pom's juice is not from concentrate is not a necessary implication. A reasonable alternative implication is that the video—which is just over one minute in length—depicts only those parts of the production process that highlight Pom's vertically integrated production model. While Organic Juice may be able to prove that the video is likely to confuse customers (as discussed above), the video is not literally false by necessary implication.

Therefore, Organic Juice's motion for partial summary judgment is denied.

### C. Pom's Motion to Dismiss or for Judgment on the Pleadings on the Amended Counterclaims is Denied.

■ By order dated September 29, 2010, the Court granted Organic Juice leave to amend its Answer and Counterclaims to incorporate additional counterclaims arising from newly discovered documents and a letter written by the FDA. Pom now moves to have the counterclaims dismissed, or in the alternative, for judgment on the pleadings. In support of its motion, Pom relies on substantially the same arguments that the Court rejected in Pom's opposition to granting Organic Juice leave to amend. By granting Organic Juice leave to amend, the Court explicitly stated that the amended counterclaims were *not* futile, meaning they could withstand a motion to dismiss. Therefore, Pom's motion to dismiss the amended counterclaims is denied.

Because this motion is frivolous and could not possibly have been brought in good faith, Organic Juice's request for attorneys fees and costs incurred in connection with this motion is granted. Organic Juice has fourteen days to submit a detailed request for fees.

### CONCLUSION

For the foregoing reasons, Pom's motion for summary judgment is denied, Organic Juice's motion for partial summary judgment is denied, and Pom's motion to dismiss the amended counterclaims or for judgment on the pleadings is denied. Pom is ordered to pay costs and attorney's fees related to the motion to dismiss.

This constitutes the decision and order of the Court.